**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Pamela Neumann, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> Home Depot U.S.A. Incorporated, *et al.*, <br><br> Defendants. | No. CV-20-00387-PHX-JJT <br><br> **ORDER** |

At issue is Defendant Home Depot U.S.A. Incorporated's ("Home Depot") Motion for Summary Judgment (Doc. 37, Mot.) to which Plaintiffs Anna, Julia, and Pamela Neumann filed a Response (Doc. 42, Resp.), and Defendant filed a Reply (Doc. 48, Reply). Also at issue is Defendant's unopposed Motion to Supplement Exhibit 4 to its Statement of Facts (Doc. 46). The Court finds these matters appropriate for decision without oral argument. *See* LRCiv 7.2(f).

**I.   BACKGROUND**

In November 2017, James Neumann ("Mr. Neumann") used a Krause ladder to climb his roof. (Doc. 45, Plaintiff's Contravening Statement of Facts ("PSOF") ¶ 60.) When Mr. Neumann was approximately halfway down the ladder, it collapsed at the middle hinges, causing Mr. Neumann to fall backwards onto his driveway and strike his head on the concrete surface. (PSOF ¶¶ 63-64.) Later that day, Mr. Neumann died of his injury. (PSOF ¶ 65.)

### A.    Mr. Neumann's Purported Purchase of the Accident Ladder

Although Pamela Neumann ("Pamela"), Mr. Neumann's surviving spouse, does not remember Mr. Neumann telling her where he bought the ladder, Pamela's friend, Rachel Corwith ("Ms. Corwith") recalls seeing Mr. Neumann in the parking lot of Defendant's Glendale, Arizona location in 1990, 1991, or 1992. (Doc. 38, Defendant's Statement of Facts ("DSOF") ¶¶ 1-2.) Ms. Corwith is sure she was at Defendant's store, because "30 years ago that section of the Valley was quite empty. It was mostly fields." (PSOF ¶ 71, citing Ex. G, Deposition of Rachel Corwith ("Corwith Dep.") at 38:15-20.) Ms. Corwith explained that there were almost no other hardware stores, which was "why we were often running to Home Depot." (PSOF ¶ 71; Corwith Dep. at 38:15-19.)

Ms. Corwith remembers Mr. Neumann attempting to catch her attention that day, because he needed assistance with fitting a ladder in the trunk of his sports car. (DSOF ¶¶ 2-4.) Ms. Corwith stated that the ladder "was still collapsed into the [four] layered segment[s] from the box" when she saw it in Mr. Neumann's car. (DSOF ¶ 5.) Ms. Corwith was not with Mr. Neumann when he first tried to put the box into the trunk, but she could see the box was dented because he had tried to close the trunk with the box inside. (DSOF ¶¶ 6-7.) Eventually, Ms. Corwith and Mr. Neumann removed the ladder from the box to successfully fit the ladder into the trunk. (DSOF ¶¶ 8-9.) They did not remove the strapping tape holding the ladder together. (DSOF ¶¶ 8-9.) Ms. Corwith stated that Mr. Neumann had been tearing at the box before she arrived, and they ultimately put the box in the back seat of Mr. Neumann's car. (DSOF ¶ 11.) The subject Krause ladder is the only articulating ladder the Neumanns have ever owned. (PSOF ¶ 73.)

### B.    History of Krause Ladders and Sales at Home Depot

Defendant proffers testimony—to which Plaintiffs object—stating that Krause began manufacturing Multimatic ladders in the United States in 1988, but Defendant maintains that the ladders were not sold in its Arizona stores until 1996. (DSOF ¶¶ 14-16, 18; PSOF ¶¶ 14-16, 18.) Defendant also proffers testimony, which Plaintiffs challenge, stating that once a Multimatic ladder was fully manufactured, the entire ladder was "shrink-wrapped" in a

plastic or cellophane film, and never had "any other packaging around it, such as cardboard." (DSOF ¶¶ 19-20.) When the 12-and 16-foot Multimatic ladders arrived at a retailer's store, they were "still shrink-wrapped," and the retailer only had to unload and display them. (DSOF ¶¶ 21-22.) The retailer did not have to assemble the products, and Defendant claims that the retailers were not supposed to inspect the product. (DSOF ¶ 23.)

Krause performed ANSI load and strength tests on the Multimatic ladder when the Multimatic was put into production. (DSOF ¶ 24.) Underwriters Laboratory ("UL") also tested the ladder model involved in Mr. Neumann's accident and confirmed that it complied with the UL standard. (DSOF ¶ 25.) Mr. Neumann's ladder had a UL label, which means UL concluded "that there were no defects in the ladder." (DSOF ¶ 29.) The ladder also passed the ANSI A14.2 performance standards and OSHA regulations in effect when it was manufactured in 1989. (DSOF ¶ 30.) However, Plaintiffs contend that the Krause ladder was later recalled for a hinge defect. (PSOF ¶ 90, Ex. B at 29-31, 33.)

### C. Mr. Neumann's Accident

In November 2017, Mr. Neumann's daughter, Julia Neumann ("Julia"), woke up and heard footsteps on the roof. (DSOF ¶ 33; PSOF ¶ 60.) She told her mother, Pamela, and they both went outside and saw Mr. Neumann on the roof. (DSOF ¶¶ 34-35.) As Pamela started to head back inside, she noticed that the Krause Multimatic ladder that Mr.Neumann used to ascend to the roof was bending inwards. (DSOF ¶ 36; PSOF ¶ 61.) Pamela told Julia about the bend and directed her to tell Mr. Neumann about it. (DSOF ¶ 37.)

Julia states that she saw the ladder was bending "somewhere between the top and the middle but not directly in the middle." (DSOF ¶ 38.) She was concerned that "something might happen" to Mr. Neumann if he descended from the ladder. (DSOF ¶ 39.) When she expressed her concerns to Mr. Neumann, he said "he thought it should be okay and that he should still come down normally." (DSOF ¶ 40.) However, Julia decided to go underneath the ladder and hold it, because she thought that it might provide additional stability in the bending part of the ladder as Mr. Neumann climbed down. (DSOF ¶¶ 41-42.)

As Mr. Neumann descended the ladder, Julia believed that the ladder was not going to hold his weight, but he continued to climb down. (DSOF ¶ 43.) Slowly, the ladder began to bend further, and the middle hinges came inwards, towards where Julia was standing. (DSOF ¶ 44.) When Julia moved her hands away from the ladder, it gave way. (DSOF ¶ 45.) Mr. Neumann fell backwards, struck his head on the concrete surface of the driveway, and later died of his injuries. (SOF, ¶ 45; MSJ Ex. 5 at 3.)

In November 2019, Mr. Neumann's surviving wife Pamela, and daughters, Julia and Anna Neumann ("Anna"), brought strict liability, negligence, and failure to warn claims against Defendant in Maricopa County Superior Court. (Doc. 1, Ex. 3 at 5-8.) Defendant removed the case to this Court pursuant to 28 U.S.C. §§ 1332 and 1441, *et seq.* (Doc. 1 at 1-2.) On December 3, 2021, Defendant moved for summary judgment, arguing that Plaintiffs' claims fail because (1) Defendant did not sell Mr. Neumann the subject ladder; (2) Plaintiffs lack admissible expert evidence[1]; (3) Plaintiffs' "negligent quality control" claim is unfounded; (4) Plaintiffs' strict liability claim is unsupported; and (5) Plaintiffs' warning defect claim is based on information that was neither known nor knowable when the ladder was sold. (*See generally* Mot.) The Court now resolves each aspect of Defendant's Motion.

## II.   LEGAL STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when: (1) the movant shows that there is no genuine dispute as to any material fact; and (2) after viewing the evidence most favorably to the non-moving party, the movant is entitled to prevail as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Eisenberg v. Ins. Co. of N. Am.*, 815 F.2d 1285, 1288-89 (9th Cir. 1987). Under this standard, "[o]nly disputes over facts that might affect the outcome of the suit under governing [substantive] law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine issue"

---

[1] The Court does not address this argument here. In its Order dated August 2, 2022, the Court determined the vast majority of Plaintiffs' expert's proffered testimony is admissible. (*See* Doc. 49.) Defendant will have the opportunity to explore any perceived weaknesses in Dr. John Morse's testimony during cross-examination.

- 4 -

of material fact arises only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.*

In considering a motion for summary judgment, the Court must regard as true the non-moving party's evidence if it is supported by affidavits or other evidentiary material. *Celotex*, 477 U.S. at 324; *Eisenberg*, 815 F.2d at 1289. The non-moving party may not merely rest on its pleadings; it must produce some significant probative evidence tending to contradict the moving party's allegations, thereby creating a material question of fact. *Anderson*, 477 U.S. at 256-57 (holding that the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment); *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968).

"A summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). "Summary judgment must be entered 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *United States v. Carter*, 906 F.2d 1375, 1376 (9th Cir. 1990) (quoting *Celotex*, 477 U.S. at 322).

## III. ANALYSIS

### A. Whether Defendant Sold Mr. Neumann the Subject Ladder is a Genuinely Disputed Material Fact

To establish either their strict liability or negligence claim, Plaintiffs must show that Home Depot sold the ladder in question to Mr. Neumann. *See Antone v. Greater Arizona Auto Auction*, 155 P.3d 1074, 1076 (Ariz. Ct. App. 2007) ("The types of parties who may be held strictly liable are limited. These limits ensure that strict liability is not extended beyond those entities who are causally linked to the defective product by having placed it into the stream of commerce.") (citing *Winsor v. Glasswerks PHX, L.L.C.*, 63 P.3d 1040, 1048–49 (Ariz. Ct. App. 2003)); *Scheller v. Wilson Certified Foods, Inc.*, 559 P.2d 1074, 1081 (Ariz. Ct. App. 1976) ("In order to establish a claim for negligence, plaintiff must

show that some action or failure to act on [the defendant's] part violated a duty owed to plaintiff.").

Defendant contends that Plaintiffs cannot show that it sold the ladder to Mr. Neumann, and thus Plaintiffs' case cannot survive summary judgment. (Mot. at 7-8.) Defendant points out that the only testimony tying it to the ladder comes from Ms. Corwith, who claims she saw Mr. Neumann in Defendant's Glendale, Arizona parking lot in 1990, 1991, or 1992. (Mot. at 8; DSOF ¶¶ 1-2.) Defendant notes that Ms. Corwith did not even see Mr. Neumann inside its store—she just saw him in the parking lot, with the ladder in his trunk. (Mot. at 8; DSOF ¶¶ 3-4, 6.) Additionally, Ms. Corwith testified that she was sure that her encounter with Mr. Neumann took place prior to 1993, but Defendant maintains that it did not sell Krause ladders in Arizona until 1996. (Mot. at 8; DSOF ¶¶ 13-16.) Further, Ms. Corwith testified that the ladder she helped Mr. Neumann load into his vehicle was enclosed in a cardboard box, and upon removing the box, plastic bands were wrapped around the ladder. (Mot. at 8; DSOF ¶¶ 8-10.) However, according to Defendant, Krause ladders were not packaged in boxes or with plastic bands; they were packaged only in shrink wrap. (Mot. at 8; DSOF ¶¶ 19-20.)

Plaintiffs counter that Defendant's argument indeed illustrates that whether Defendant sold the ladder to Mr. Neumann is a disputed fact. (Resp. at 3.) According to Plaintiffs, the Krause ladder is the only articulating ladder Plaintiffs have ever owned. (PSOF ¶ 72.) Plaintiffs also note that Ms. Corwith is positive that she ran into Mr. Neumann at Defendant's store. (PSOF ¶¶ 69-70.) She explained that there were almost no other hardware stores in the area at the time, which was "why we were often running to Home Depot." (PSOF ¶ 71; Corwith Dep. at 38:15-19.) Further, when questioned by Defendant's counsel, Ms. Corwith described an articulating ladder with four folding segments, which is consistent with the ladder at issue here. (PSOF ¶ 73.)

Plaintiffs also challenge the propriety of Defendant's reliance on Brian Haubenschild ("Mr. Haubenschild") and Ed Hansen ("Mr. Hansen") as witnesses, but the

- 6 -

Court does not address these arguments here.[2] (Resp. at 5-9.) Defendant uses Mr. Haubenschild and Mr. Hansen's testimony to support its arguments that it did not sell Krause ladders in Arizona until 1996, and also that Krause ladders were packaged only in shrink wrap. Plaintiffs maintain that even if the prior testimony of Mr. Haubenschild and Mr. Hansen is admitted, it does not resolve the factual issue of whether Mr. Neumann purchased the subject ladder at Defendants' store. Mr. Haubenschild became a merchandizer for Defendant's West Region in 1996, but Plaintiff argues that the fact that he chose to sell Krause ladders in 1996 does not prove that the ladders were not sold in Arizona in years prior to that. (Resp. at 9.) Additionally, Plaintiff asserts that the excerpts from Mr. Hansen's testimony do not show that he has the appropriate foundation to testify as to the packaging conditions of all Krause ladders sold during the relevant time period. (Resp. at 9.)

---

[2] Plaintiffs explain that on the last day for pre-trial disclosures, and two weeks before discovery closed, Defendant updated its MIDP responses to disclose deposition excerpts of Mr. Haubenschild, but neither attached nor described the content of the excerpts. (Resp. at 5.) Plaintiffs claim that the first time they saw the transcripts was as attachments to Defendant's Motion for Summary Judgment. (Resp. at 5.) Plaintiffs allege that this is gamesmanship, and as a result they did not have the chance to cross-examine or conduct any discovery upon Mr. Haubenschild or Mr. Hansen. (Resp. at 6.) Not only do they claim that they will suffer prejudice by the admission of Mr. Haubenschild's testimony, but Plaintiffs also contend that the previous depositions of Mr. Haubenschild and Mr. Hansen are not admissible. (Resp. at 7.)

Defendant claims that it disclosed Mr. Haubenschild and Mr. Hansen as witnesses and provided transcripts to Plaintiffs on October 29, 2021, via an email containing a share file link, before discovery closed on November 12, 2021, and well before its Motion for Summary Judgment was filed on December 3, 2021. (Reply at 2; *see also* Doc. 26, Order.) As to the timing of the disclosure, Defendant argues that it did not know the packaging of the ladders or the year that it began selling them was at issue until Ms. Corwith was deposed on July 15, 2021, nor did it realize it had copies of Mr. Haubenschild and Mr. Hansen's depositions until "shortly before the 26(a)(3) deadline." (Reply at 3.) Moreover, Defendant contends that the experts' testimony is admissible. (Reply at 3-5.)

The Court does not need to address the admissibility of Mr. Haubenschild and Mr. Hansen's prior testimony to determine that summary judgment is improper here. Plaintiffs may present their arguments pertaining to Mr. Haubenschild and Mr. Hansen's prior testimony in their Motions in Limine before trial.

The Court agrees with Plaintiffs—whether the subject ladder was purchased at Defendant's store is an issue of fact for a jury to determine. Because the Court cannot determine as a matter of law whether Defendant sold Mr. Neumann the subject ladder, this portion of Defendant's Motion for Summary Judgment is denied.

### B.  Plaintiffs' Strict Liability Claim

Arizona has adopted the doctrine of strict products liability as set forth in the Restatement (Second) of Torts § 402A. *Gaston v. Hunter*, 588 P.2d 326, 338 (Ariz. Ct. App. 1978). A party may be held strictly liable for selling a product in a defective condition that is unreasonably dangerous to a user or consumer. *Scheller v. Wilson Certified Foods, Inc.*, 559 P.2d 1074, 1076 (Ariz. Ct. App. 1976). To establish a prima facie case of strict liability, a plaintiff must show: (1) the product was in a defective condition when it left the defendant's control; (2) the defective condition made the product unreasonably dangerous; and (3) the defect caused plaintiff's injuries. *Jimenez v. Sears, Roebuck & Co.*, 904 P.2d 861, 864 (Ariz. 1995). There are three defective condition theories: (1) manufacturing defects, (2) design defects, and (3) informational defects. *Brown v. Sears, Roebuck & Co.*, 667 P.2d 750, 756 (Ariz. Ct. App. 1983). Here, Plaintiffs allege a design defect. (*See* Compl. ¶ 35.)

Arizona courts have adopted two alternate tests to establish the existence of an unreasonably dangerous design defect: (1) the consumer expectation test, and (2) the risk/benefit analysis. *Dart v. Wiebe Mfg., Inc.*, 709 P.2d 876, 879 (Ariz. 1985). The consumer expectation test applies where an ordinary consumer has experience with the product and thus has a reasonable expectation of how safely it should perform. *See id.* at 878–79. The risk/benefit analysis applies where an ordinary consumer lacks experience with the product, and thus lacks a reasonable expectation as to its "safe" performance. *See id.* Here, because an ordinary consumer has experience with a ladder and thus has a reasonable expectation of how it safely should perform, the consumer expectation test applies. *See Feuerstein v. Home Depot, U.S.A., Inc., et al.*, No. 2:12-cv-01062 JWS, 2014

WL 2557122, at *4 (D. Ariz. June 6, 2014) (applying the consumer expectation test in a design defect case involving an articulating ladder).

Defendant argues that summary judgment is proper on Plaintiffs' strict liability claim because Plaintiffs cannot establish that any defect in the subject ladder caused Mr. Neumann's injuries. (Mot. at 12-13.) Defendant relies on *Bailey v. Ethicon Inc.* to support its argument, where the court held that a plaintiff alleging strict liability "must present sufficient evidence from which a juror could determine that causation is 'probable' not 'merely possible,'" and noted that expert testimony that an injury "could" or "may" have been caused by something is "generally insufficient." No. CV-20-00457-TUC-JAS (LCK), 2021 WL 4844393, at *8 (D. Ariz. July 13, 2021). Defendant contends that neither of Plaintiff's expert, Dr. John Morse's ("Dr. Morse"), proffered theories are probable. (Mot. at 12.) First, Defendant discusses Dr. Morse's "false lock" scenario, wherein Mr. Neumann thought the joints on the ladder were locked when in reality they were not. (Mot. at 12.) Defendant observes that, although Dr. Morse claims the false lock scenario is "plausible," he concedes that if the false lock scenario were the cause of the collapse, Mr. Neumann would have likely fallen as he ascended, not descended the ladder. (Mot. at 12; DSOF ¶¶ 49-50.) Second, Defendant asserts that Dr. Morse's "kick the bar" scenario is not probable either, because based on Julia's testimony that Mr. Neumann was not quite halfway down the ladder when the fall occurred, Mr. Neumann's feet were not on the rung that contained the release bar. (Mot. at 13.)

Plaintiffs claim that in asking the Court to find that they cannot establish causation, Defendant is asking the Court to settle a disputed fact. (Resp. at 11.) Plaintiffs acknowledge that Dr. Morse opined that the "kick the bar" scenario was more likely than the "false lock" scenario, but he nonetheless found that both scenarios were possible due to the design of the subject ladder. (Resp. at 12; PSOF ¶ 84.) Further, Plaintiffs suggest that Defendant overreaches in asserting that Julia's testimony precludes the "kick the bar" scenario. Julia testified that her father was "about halfway," and was "a step or two above the halfway point," but it is not clear if she meant Mr. Neumann's body was a step or two above the

halfway point, or if his feet were a step or two above that point. (Resp. at 12; PSOF ¶¶ 87-88; *see also* Dr. Morse Rebuttal Report, Doc. 41, Ex. B at 10.) According to Plaintiffs, a juror could rely on either scenario to determine that causation is probable, so a jury should be left to settle how the facts of this case apply to the two possible causes of the collapse. (Resp. at 13.)

On these facts, the Court finds that the question of whether any defect in the subject ladder caused Mr. Neumann's injury is properly within the ambit of the jury. *See Wisener v. State*, 598 P.2d 511, 513 (Ariz. 1979) ("Circumstantial evidence, expert testimony, or common knowledge may provide a basis from which the causal sequence may be inferred. Such questions are peculiarly for the jury, (and) are questions on which a court can seldom rule as a matter of law.") (quoting W. PROSSER, LAW OF TORTS § 41, 242-43 (4th Ed. 1971)). Further, to the extent that Defendant highlights the fact that Plaintiff's evidence is largely circumstantial to support its contention that a juror could not determine that causation here is "probable," as opposed to "merely possible," the Court notes that plaintiffs are permitted to rely on circumstantial evidence alone in strict liability cases. *See Dietz v. Waller*, 685 P.2d 744, 747 (Ariz. 1984). Defendant's Motion for Summary Judgment is denied as to Plaintiffs' strict liability claims.

### C.     Plaintiffs' Negligence and Warning Defect Claims

Defendant also moves for summary judgment on Plaintiffs' negligence and warning defect claims. (*See generally* Mot.) In light of the discovered evidence, Plaintiffs withdraw their negligence and warning defect claims. (Resp. at 16.) Accordingly, these claims are dismissed.

**IT IS THEREFORE ORDERED** denying Defendant's Motion for Summary Judgment (Doc. 37.)

**IT IS FURTHER ORDERED** dismissing Plaintiffs' negligence and warning defect claims.

**IT IS FURTHER ORDERED** denying as moot Defendant's Motion to Supplement Exhibit 4 (Doc. 46).

**IT IS FURTHER ORDERED** directing the Clerk of Court to enter judgment accordingly. Plaintiffs' strict liability claim will proceed to trial. The Court will set a pretrial conference by separate order.

Dated this 26th day of August, 2022.

Honorable John J. Tuchi
United States District Judge